**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 11-cv-02639-MSK-CBS

**SHERRY L. DERAY, as heir and next of kin of John R. Winkler (deceased),**

      **Plaintiff,**

**v.**

**CITY OF COLORADO SPRINGS, COLORADO;**
**RICHARD MYERS;**
**RONALD SHEPPARD;**
**CARLOS SANDOVAL; and**
**JOHN HAVENAR,**

      **Defendants.**

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART**
**MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment (**# 35**), Ms. Deray's response (**# 36**), and the Defendants' response (**# 37**).

## FACTS

The facts of this matter are mostly undisputed.   Defendants Sandoval and Havenar are

Colorado Springs Police Officers.  On October 12, 2010, they contacted Ms. DeRay, attempting

to locate her son, Mr. Winkler, in order to execute an arrest warrant.  Ms. DeRay advised that

Mr. Winkler might be found at an apartment complex on Vindicator Drive.  She further advised

the officers that Mr. Winkler suffered from a mood disorder, anxiety, and depression; that he had

attempted suicide twice in the prior January; and that she had had a heated conversation with him

a few days earlier in which "he told her that he hated her and that he wanted to kill himself."

1

Officers Sandoval and Havenar went to the Vindicator Drive address and discovered Mr. Winkler outside, talking to another individual.  At this juncture, the parties' factual contentions differ.

According to the Defendants, Officer Sandoval approached Mr. Winkler, told him to place his hands behind his back, and attempted to place him in handcuffs.  Before Officer Sandoval was able to place the second handcuff on Mr. Winkler, however, Mr. Winkler began to move forward towards an open field.  Believing that Mr. Winkler was attempting to escape, Officer Sandoval performed a "armbar takedown" of Mr. Winkler.  Officer Sandoval testified that "in the process [of the takedown] I believed he was going to resist," and thus, attempted to perform "a knee strike towards his shoulder area."  The strike missed, but when Mr. Winkler went down to the ground, he did not resist and complied with Officer Sandoval's instructions. Officer Sandoval states that he "controlled [Mr. Winkler's] right arm by placing . . . my left knee in the small of his back and my right knee towards the shoulder blade area of his right shoulder."  Officer Havenar took control of Mr. Winkler's right arm, and the officers completed the task of handcuffing Mr. Winker.

Ms. Deray relies entirely on the deposition testimony of Tyler Tubbs, the person to whom Mr. Winkler was talking when the officers arrived.  She asserts that the officers grabbed Mr. Winkler and "slammed hi[s]" chest and face down onto the trunk of a car the men were standing near, then "kicked [him] in the back of his knee," causing him to fall to the ground, and then "forcefully pushed . . . his head and face [onto] the ground."  Mr. Tubbs' initial description of the events did not include descriptions of any other acts of physical force by the officers, but upon cross-examination at his deposition, he added that "I saw them kick him once or twice more when he was on the ground," after Mr. Winkler had already been handcuffed.

What happened thereafter is undisputed.  Officer Havenar walked Mr. Winkler over to the unmarked patrol car, placed him in the right front passenger seat, and seatbelted him.  Officer Havenar took a seat in the left rear passenger seat, and Officer Sandoval drove the car towards the Colorado Springs Criminal Justice Center via Interstate 25.  During the drive, Mr. Winkler began to cry and talk about the warrant against him.  Officer Sandoval observed Mr. Winkler repeatedly bending forward at the waist, an action he believed was an attempt by Mr. Winkler to wipe his face or his nose on the computer installed on the dashboard of the vehicle.  By the time the vehicle was on the Interstate, Mr. Winkler began talking about how "he doesn't like his life, that he's a loser," that he wanted to die, and so on.

At some point, Officer Havenar observed Mr. Winkler fidgeting in his seat, behavior that Officer Havenar stated was common with individuals who were handcuffed behind their backs as they attempted to find a comfortable sitting position.  Officer Havenar observed Mr. Winkler place his finger on the release button for his seat belt.  Officer Havenar instructed him not to unbuckle the belt, but Mr. Winkler ignored the instruction, and, in a single movement, rotated his body so that his back (and his cuffed hands) faced the passenger's side door.  Within the span of a few seconds, the passenger's side door opened and Mr. Winkler fell out, onto the highway.  Officer Sandoval braked, bringing the car to a stop.  Mr. Winkler got up from the pavement and began running westward, but was struck by an oncoming car and was killed.

Ms. DeRay, in her capacity as representative of Mr. Winkler's estate, commenced this action (**# 1**) alleging two claims for relief: (i) a claim for common-law negligence, apparently asserted against all Defendants; and (ii) a claim invoking 42 U.S.C. § 1983 against all

Defendants, apparently arising under the 4th, 8th, and 14th Amendments to the United States Constitution.[1]

The Defendants move **(# 35)** for summary judgment on these claims.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

---

[1]  In an Order dated May 24, 2012 **(# 25)**, the Court dismissed: (i) any 4th Amendment claim against Defendants Meyers and Sheppard sounding in excessive force arising out of the initial arrest of Mr. Winkler, on the grounds that Ms. DeRay had not alleged facts sufficient to warrant the imposition of supervisory liability against those Defendants for any actions committed by Officers Sandoval and Havenar during Mr. Winkler's arrest; (ii) any claim against the City of Colorado Springs arising out of Mr. Winkler's arrest; and (iii) any 8th Amendment claims against Officers Sandoval and Havenar based on their failure to provide Mr. Winkler with mental health treatment prior to or during the events at issue.

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. See Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a prima facie claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B. § 1983 claim**

The parties appear to agree that Ms. DeRay is alleging two separate strands of claims under § 1983: (i) claims arising out of the events of Mr. Winkler's initial arrest (*i.e.* a claim of excessive force against Officers Sandoval and Havenar), and (ii) substantive due process claims associated with the transportation of Mr. Winkler. The Court addresses each strand in turn.

1. <u>Excessive force during arrest</u>

The 4th Amendment protects persons against "unreasonable searches and seizures." U.S. Const., 4th Am. That protection ensures that police officers may not use an excessive amount of

force when effecting an arrest. *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The sole question is whether the amount of force used by police was "objectively reasonable" under all the circumstances  *Id.* at 396.   The Court does not inquire into the subjective intent or motivation of the officer in administering the force, and it examines the apparent need for the use of force based on the circumstances as they appeared to officers on the scene, not through a post-hoc review of the situation in hindsight. *Id.* at 396-97.  Among the factors that the Court reviews in determining the objectively-reasonable amount of force permissible in a situation are: (i) the severity of the crime for which the arrest is being made; (ii) whether the suspect poses and immediate threat to the safety of the officers or others; and (iii) whether the suspect is actively resisting. *Id.* at 396; *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012).

Construing the evidence – notably the testimony of Mr. Tubbs - in the light most favorable to Ms. DeRay, Officers Sandoval and Havenar arguably applied an excessive amount of force to Mr. Winkler when: (i) they "slammed" his chest and head on the trunk of the car when initially attempting to handcuff him; and when (ii) they "kicked him once or twice" while he was on the ground and handcuffed.

The Court finds that the alleged "slamming" of Mr. Winkler's body against the trunk of the car was an objectively reasonable use of force.  In this respect, the first and third *Graham* factors tip largely in Mr. Winkler's favor.  The crimes underlying the warrants for which he was being arrested were theft and controlled substances offenses, and although they were felony offenses, Officer Havenar acknowledged that they were not violent offenses.   Moreover, at the time officers made the initial contact with Mr. Winkler, he was not resisting; the record indicates that the officers made that contact with him immediately after he identified himself to them. However, the second factor, officer safety, tips in favor of authorizing the officers to engage in

some limited use of force.  Mr. Winkler was apprehended outdoors and in the company of Mr.

Tubbs.  Officers have some leeway to quickly effectuate an arrest when the suspect being

arrested is in the presence of others whose potential reactions to the situation cannot readily be

predicted.  Moreover, the officers had been advised by Ms. DeRay that Mr. Winkler suffered

from a mood disorder, making his own potential reaction to being arrested somewhat

unpredictable.  Under these circumstances, the Court cannot say that it was objectively

unreasonable for officers to initially immobilize Mr. Winkler by pushing him (or even

"slamming" him) against the vehicle he was standing near in order to place him in handcuffs.

Mr. Tubbs' testimony does not describe an event inconsistent with police officers suddenly and

forcefully pinning Mr. Winkler in place; Mr. Tubbs does not, for example, allege that the officers

repeatedly "slammed" him repeatedly against the car or punched him gratuitously.  Under these

circumstances, the Court cannot say that the initial "slamming" of Mr. Winkler into the car is

sufficient to support an excessive force claim.  *See Graham*, 490 U.S. at 396 ("not every push or

shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the

Fourth Amendment").

However, the Court reaches a different finding with regard to the allegation by Mr. Tubbs

that the Defendants "kicked" Mr. Winkler "once or twice" while he lay handcuffed on the

ground.  At that point in time, none of the *Graham* factors warrants applying additional force to

Mr. Winkler, as his apprehension has been completed.  At that point in time, Mr. Winkler poses

no possible safety risk, being on the ground and handcuffed, and presumably, the officers have

ascertained that Mr. Tubbs did not pose any additional risk to them.  Because the Court cannot

conclude that it is ever objectively reasonable for a police officer to administer kicks to a suspect

that has been handcuffed and is lying on the ground, the Court finds that summary judgment against Ms. DeRay on the excessive force claim is inappropriate.

There is difficulty in determining which officer allegedly administered the kicks, however. Mr. Tubbs' deposition testimony indicates that he was unable to identify the officer that delivered the kicks, and Ms. DeRay has not come forward with other evidence that would clarify the situation. Officer Sandoval acknowledges in his reply brief that "it would be reasonable to mistake Officer Sandoval's attempted knee strike as a kick," and that "it would also be reasonable to mistake Officer Sandoval's restraint [of Mr. Winkler by using his knees against Mr. Winkler's back and shoulder] as a strike." Thus, the Court finds that there is a triable issue of fact as to whether Officer Sandoval administered "kicks" to Mr. Winkler after completing the handcuffing, or whether Mr. Tubbs' references to "kicks" simply reflects a mistaken perception of Officer Sandoval's mid-handcuffing contact with Mr. Winkler. Summary judgment on the excessive force claim is thus granted as to Officer Havenar, but denied as to Officer Sandoval.[2]

### 2. Transportation-related claims

The remainder of Ms. DeRay's claims arise out of the transportation of Mr. Winkler. The Court begins by examining whether that conduct gives rise to a colorable § 1983 claim, and then turns to Ms. DeRay's common-law negligence claim.

### a. § 1983 claims

---

[2]      The Defendants invoke the doctrine of qualified immunity as to Ms. DeRay's § 1983 claims. The Court need not extensively address whether Mr. Winkler's right to be free from excessive force in these circumstances was "clearly established." It is axiomatic that a police officer is prohibited by the Fourth Amendment from kicking a handcuffed suspect who is lying on the ground, to the point that citation to authority supporting such a proposition is entirely unnecessary.

The Court has previously concluded that Ms. DeRay has alleged a substantive due process claim arising under the 14th Amendment as it relates to Mr. Winkler's death during transport.  State actors are normally not required to guarantee certain minimal levels of safety and security to individuals, but in two specific circumstances, the actor is obligated to protect an individual against harm.  *Estate of B.I.C. v. Gillen*, 702 F.3d 1182, 1187 (10th Cir. 2012).  Those circumstances are where the state actor either: (i) created or increased the danger to the individual; or (ii) assumed a "special relationship" with the individual.  *Id.*  For practical purposes, the two theories differ primarily in the question of whether the victim is involuntarily in state custody at the time of the harm: if so, the Court applies the "special relationship" analysis; if not, the Court considers whether the "danger creation" theory applies.  *Gray v. Univ. of Colo. Hospital Authority*, 672 F.3d 909, 922-23 (10th Cir. 2012).

This Court has some doubt as to the appropriate theory to apply to this case: it is abundantly clear that Mr. Winkler was involuntarily in the custody of the Colorado Springs Police when the events that culminated in his death transpired, but it is difficult for the Court to conclude that it was that custodial relationship that caused the harm.  As *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 200 (1989), explains, the salient characteristic giving rise to liability in the "special relationship" situation is "the state's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration [or otherwise], not its failure to act to protect his liberty interests against harms inflicted by other means."  *Id.*  Here, the harm resulted not from Mr. Winkler's **inability to act on own behalf**, but instead from his **ability to do so**.  Put another way, Mr. Winkler's restraints did not result in his death.  Instead, it was Mr. Winkler's ability to circumvent his restraints - to exit the car and to

run into the roadway - that caused his death.  Thus, it is difficult to say that *DeShaney* would permit a substantive due process claim to lie under the "special relationship" theory.

The Court therefore turns to the "danger creation" theory.  As explained in *Armijo by and through Chavez v. Wagon Mound Public Schools*, 159 F.3d 1253, 1262-63 (10th Cir. 1998), such a claim lies if Ms. DeRay can show: (i) that Mr. Winkler was a member of a limited and specifically definable group; (ii) the Defendants' conduct put him at substantial risk of serious, immediate and proximate harm; (iii) the risk was obvious or known to the Defendants; (iv) the Defendants acted recklessly or in conscious disregard of that risk; (v) that conduct, when viewed in total, is shocking to the conscience; and (vi) the Defendants' actions created or enhanced Mr. Winkler's vulnerability to the danger in some way.

*Armijo* is illustrative. There, the plaintiff was a high school student, who was known to have made suicidal threats.  After an incident in which he threatened a teacher, the school suspended him.  Contrary to school policy, the school officials did not contact the student's parents to inform them of the suspension or to advise them that the student would be sent home. Instead, the school officials transported the student by car to his home and left him there, unattended.  The student committed suicide shortly thereafter.  *Id.* at 1256-57.  The trial court denied the school officials' request for summary judgment on the student's estate's substantive due process claim against them, and the officials brought an interlocutory appeal.  The 10th Circuit affirmed the denial of summary judgment, finding a sufficient showing for trial. Although it characterized the evidence as "thin", it was sufficient to show that: (i) the student was a member of a limited and definable group, namely "students who have expressed threats of suicide"; (ii) the officials' conduct in suspending the student and leaving him home alone created an immediate proximate danger of self-harm; (iii) the defendants had "some knowledge" that the

student was suicidal and distraught, was unable to care for himself, was being left home alone, and had access to firearms; (iv) that 'by taking this action, knowing of Armijo's vulnerability and the risks of being left alone at home," the officials acted recklessly and in conscious disregard of the risk of suicide;

(v) that such conduct, if true, "possibly could be construed as conscience-shocking"; and (vi) that by leaving the student unsupervised, the officials increased the risk of harm to him. *Id.* at 1264.

From a conceptual standpoint, the facts of this case are somewhat similar. However, there are several critical elements for which there is no evidence. Most significantly, the Court finds that Ms. DeRay has not come forward with sufficient evidence to demonstrate the fourth and fifth elements: that the Defendants' actions were reckless and in conscious disregard of the risk to Mr. Winkler and that their conduct was conscience-shocking.

### a. deliberate indifference

As to the *mens rea* element, Ms. DeRay must prove more than merely negligence on the parts of Officers Sandoval and Havenar. *Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226, 1239 (10th Cir. 1999). Certainly, a state actor <u>intentionally</u> exposing a victim to an increased risk of harm suffices, but beyond that, the question of whether some lesser form of mental state is sufficient becomes more difficult. *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). In *Lewis*, the Supreme Court explained that the *mens rea* element necessary to for a substantive due process claim necessarily varies with the circumstances, most significantly, the degree of urgency underlying the challenged action. It explained that in circumstances where courts had predicated liability on the actor's "deliberate indifference" to the harm facing the victim, such liability "rests upon the luxury enjoyed by prison officials of having time to make

unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations[; w]hen such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." 523 U.S. at 853. On the other hand, "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose" to permit liability. *Id.*

Assuming without deciding that a showing of recklessness is sufficient to demonstrate deliberate indifference, there is insufficient evidence of record to satisfy that standard. "Deliberate indifference" necessarily requires that the actor <u>subjectively</u> recognizes the risk of harm, and nevertheless chooses to disregard it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("We reject petitioner's invitation to adopt an objective test for deliberate indifference[;]. . . .the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

The record does not show that Officers Sandoval and Havenar recognized a risk that by placing Mr. Winkler in the front seat of the patrol car, rather than the back seat, he might harm himself by jumping out of the car and being hit by other traffic. To the contrary, the record reflects that the officers chose to place Mr. Winkler in the front seat, rather than the back seat, based on a belief that doing so <u>reduced</u> the risk of him being harmed. They point out that, because of the configuration of in-vehicle computers and other equipment, the front passenger seat forms a sort of "compartment" that makes it difficult for a suspect seated there to reach over to the driver and makes it more likely that the officer seated in the back will be able to obtain physical control of a rambunctious suspect; when the suspect is seated in the back seat and to the right of the second officer, "they're sitting right next to [that officer's] gun," raising the risk that the suspect will attempt to obtain the gun. The record does <u>not</u> reflect that either officer ever

subjectively contemplated the possibility of Mr. Winkler removing his seat belt and jumping out of a moving car.  Indeed, Officer Havenar testified that if a suspect were to remove his seat belt, it would be because the suspect intends "to aggressively come towards us, do something like that," but that "I would never think that someone is going to jump from the car."

The fact that the officers were aware that Mr. Winkler had attempted suicide in the past, that he had threatened suicide during a recent conversation with his mother, or even that he mentioned suicide during the ride[3] does not change the analysis.  The desire to commit suicide by itself does not necessarily nor logically lead to an increased likelihood that Mr. Winkler would  unbuckle his seatbelt, open the door to the car, fall out, get up, run and be hit by another car.  It may have been negligent for the officers not to consider the totality of the information given to them at the time they decided to put Mr. Winkler in the front seat or to consider all possible ways that he might do himself harm, but negligence is not sufficient to give rise to a substantive due process claim.

Ms. DeRay has not offered evidence to suggest that the officers <u>consciously</u> considered the information about Mr. Winkler's suicide at that time, correlated it to an increased risk of harm if he were placed in the front seat as compared to the back seat or otherwise restrained. Therefore, they cannot be said to have acted with <u>deliberate</u> indifference.

Ms. DeRay points out that the officers' decision to place Mr. Winkler in the front seat of the patrol car was contrary to Colorado Springs Police Department statements of policy.  She is correct: General Order 770.26 provides that, when transporting suspects in a vehicle without a

---

[3] Although Mr. Winkler made statements to the effect of "I just want to die" <u>during</u> the transport (that is, after the decision to place him in the front seat had been made), but as Officer Havenar testified in his deposition that such expressions of lamentation were common in arrestees, and therefore they were not understood as relating to any risk related to the mode of transportation.

specially-designed "cage" area, "a prisoner being transported by two officers will be seat belted

in the back seat, right side.  One of the officers will ride in the back seat, left side."  It is

undisputed that the officers' decision to place Mr. Winkler in the front seat violated that policy.[4]

However, the fact that the officers violated department policies does not does not automatically

give rise to a constitutional violation.  *Hostetler v. Green*, 323 Fed.Appx. 653, 657-58 (10th Cir.

2009) (unpublished), *citing Hovater v. Robinson*, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993).  As

*Hostetler* explains, an officers violation of a policy, <u>along with</u> evidence that the officer was

aware that the rationale underlying that policy was to prevent a particular kind of risk, might be

sufficient to permit an inference of the officer's subjective knowledge that disregarding the

policy might create a risk of the harm occurring.  *Id.* at 658.  But *Hostetler* distinguished *Hovater*

as a case where the court refused to permit such an inference where the apparent rationale for the

policy was to address a different risk than the one that actually occurred.  1 F.3d at 1068.  Ms.

DeRay has not come forward with evidence indicating either the purpose behind General Order

700.26 or that the purpose was to protect suspects against the risk of suspects committing suicide

by jumping from moving cars, much less demonstrated that Officers Sandoval and Heavener

were aware of and disregarded that rationale.

Accordingly, the Court finds that Ms. DeRay has failed to demonstrate a triable issue of

fact as to whether Officers Sandoval and Havenar acted with a sufficiently culpable state of mind

when deciding to place Mr. Winkler in the front seat for transportation.

b.  <u>shocks the conscience</u>

---

[4]     Ms. DeRay points out other aspects of stated department policies that the officers' actions
violated, such as the requirement that mentally ill prisoners must be transported in a vehicle with
a cage.

Ms. DeRay must also identify conduct by the Defendants that is "shocking to the judicial conscience."

The Court acknowledges the tragedy of Mr. Winkler's death and Ms. DeRay's loss. However, what constitutes "conscience-shocking" behavior is not driven by sympathy and compassion. It is necessarily a factually-intensive inquiry that "evades precise definition and evolves over time." *Schwartz v. Booker*, 702 F.3d 573, 585-86 (10th Cir. 2012). In assessing whether "degree of outrageousness and magnitude of potential or actual harm" and whether the conduct rises to the level of "conscience-shocking," the Court is guided by "three principles": (i) the need for restraint in defining the scope of a substantive due process claim; (ii) the concern that § 1983 not displace state tort law; and (iii) the need for deference to local policymaking bodies in making decisions impacting upon public safety. *Id.*, *citing Uhlrig v. Harder*, 64 F.3d 567, 473 (10th Cir. 1995). A showing of "a high level of outrageousness" is necessary, because a substantive due process claim "requires more than an ordinary tort." *Uhlrig*, 64 F.3d at 574.

Taking all the facts in the light most favorable to Ms. DeRay, the Court does not find the Defendants' conduct to be "conscience-shocking." Certainly, one can criticize the judgment of Officers Sandoval and Havenar in placing Mr. Winkler in the front seat of the car, rather than in the back seat as police regulations directed. One might also criticize them for not giving careful and thoughtful consideration to Mr. Winkler's suicidal desires. But the decision to put Mr. Winkler in the front of the car was not arbitrary, nor without colorable justification. Officer Havenar's explanation as to how placing a suspect in the front seat instead of the back seat promotes concerns of officer safety is reasonable (even if contrary to a department policy whose underlying justification remains unknown). The record does not reflect that the officers were cavalier with regard to Mr. Winkler; they kept him bound in handcuffs and belted him in, and it

is undisputed that Officer Havenar attempted to calm Mr. Winkler when he became upset. Moreover, the Court cannot ignore the fact that it was Mr. Winkler's own affirmative actions that led to his demise - he deliberately unbuckled his seat belt, deliberately opened the door,[5] and, by all appearances, deliberately chose to stand up and run away from the stopped police vehicle and into oncoming traffic.   One might be more outraged if the officers had known from previous examples or statistics that a detainee in the front seat might open the door to escape the vehicle, or if the officers were aware that Mr. Winkler had removed his seat belt or observed him repeatedly attempting to unfasten it, yet chose to ignore these conditions.   But the record reveals a surprising, unprecedented, rapidly developing situation which required a rapid response particularly by Officer Sandoval who observed Winkler's activities while driving the car. Arguably, to find the act or decision which was pivotal requires traveling back in time to the moment when the Officers placed Mr. Winkler in the front seat of the car.[6]  Yet it is only hindsight that reveals the importance of that decision.  Without knowing the ultimate

---

[5]     Ms. DeRay's briefing seems to imply doubts that Mr. Winkler voluntarily chose to open the door or jump from the car, suggesting instead that Officer Sandoval's rapid braking of the vehicle and turn to the left after discovering that Mr. Winkler had removed his seatbelt created sufficient inertia to cause the door to come open or Mr. Winkler to fall out.   The Court merely observes that the record clearly contradicts this implication.

[6]     Ms. DeRay posits that other decisions made by the officers – such as the decision to take Interstate 25 instead of lower-speed surface streets – should also be considered evidence of "conscience-shocking" conduct, but these arguments are entirely speculative.   Even Ms. DeRay's own tendered expert on police procedures, Mr. Emerson, does not opine that the officers' decision to take the highway was inconsistent with what police officers would be expected to do in such a situation.

Ms. DeRay also posits that decisions made even earlier by the officers – i.e. not to call for a patrol car with an enclosed "cage" to transport Mr. Winkler – contribute to the conscience-shocking nature of the Defendants' conduct.   The Court merely notes that the conscience-shocking nature of such acts rapidly diminishes as the chain of causation adds links, and decisions such as these are far removed from the end of that chain.

16

consequences, were one to "stop the film" at the moment Mr. Winkler is placed in the front seat, the decision would not be "conscience-shocking" or "outrageous".

It appears to the Court that the officers' decisions and actions, at most may rise to the level of  negligence.  As such, it would be inappropriate to extend the reach of the due process clause to encompass them.  *See Uhlrig*, 64 F.3d at 573 ("[t]he Due Process Clause 'is not a guarantee against incorrect or ill-advised [government] decisions"). State tort law (to the extent it is available, as discussed below) provides an adequate mechanism to address such conduct. Allowing the machinery of the due process clause to be invoked in circumstances such as this would so greatly expand the reach of the substantive due process clause as to constitutionalize a huge swath of ordinary tort claims.  As a result, the Defendants are entitled to summary judgment on her § 1983 claim sounding in substantive due process.

### C.  Negligence claim

Finally, the Defendants seek summary judgment on Ms. DeRay's claim of common-law negligence.

As a general rule, the Colorado Governmental Immunity Act provides that public entities and employees thereof are entitled to sovereign immunity for tort claims brought against them. C.R.S. § 24-10-106.  Absent a showing that the City of Colorado Springs has waived that immunity under C.R.S. § 24-10-104, Ms. DeRay must demonstrate that her negligence claims fall within one of the designated exceptions in the Act.  Whether a waiver applies to a given set of facts constitutes an issue of subject-matter jurisdiction. *Harris v. Regional Transportation Dist.*, 15 P.3d 782, 783-84 (Colo. App. 2000).  Grants of immunity are to be strictly construed against the state, and the availability of a waiver provision is to be deferentially construed in favor of victims.  *Id.* at 784.

Ms. DeRay's brief does not squarely address the portion of the Defendants' motion that argues that she cannot demonstrate that her claims fall within any of the statutory exceptions. The Defendants posit that the most likely exception is the one waiving immunity for claims arising from "the operation of a motor vehicle, owned or leased by [a] public entity, by a public employee while in the scope of employment." C.R.S. § 24-10-106(1)(a). Ms. DeRay appears to agree that, to the extent she can establish an exception to the immunity conferred by the Act, it is through this provision. Accordingly, the Court considers whether Ms. DeRay's claims of common-law negligence arise from the "operation" of a public vehicle.

Ms. DeRay contends that there are two different categories of negligent acts by the officers that could be said to arise from the "operation" of the patrol car: (i) the failure of the officers to follow the various strictures of the Colorado Springs Police Department when arranging transportation of persons such as Mr. Winkler; and (ii) a laundry list of acts relating to Officer Sandoval's actual driving, including "by slowing down, avoiding a busy high-speed interstate and taking another route, driving with less erratic control of the vehicle . . ., using the incorporated "child locks," [and] pulling over to calm a disturbed or sick passenger."

Colorado courts have interpreted the term "operation" to mean "the actions of the operator related to physical control of the functions of the motor vehicle." *Young v. Jefferson County Sheriff*, 292 P.3d 1189, 1191-92 (Colo. App. 2012). In *Young*, the plaintiffs were inmates in the custody of the Jefferson County Sheriff, being transported by van. The van was involved in an accident and the inmates, who were not secured by seatbelts, suffered injuries as a result. The inmates sued, claiming that the failure of the defendant to fasten their seatbelts constituted negligence, and the defendant contended that the fastening of a seatbelt (or not) was not an act relating to the "operation" of a motor vehicle sufficient to bring the inmate's claims

outside the scope of sovereign immunity.  The Court of Appeals concluded that the term

"operation" of a vehicle included the operator's obligation to ensure that passengers were safely

loaded into the van.  *Id.* at 1192, *citing Harris*, 15 P.3d at 784 (Colo. App. 2000) (bus driver

allowing snow and ice to accumulate on bus stairs not immune from claim by passenger who

slipped on it; ensuring the safe embarkation and debarkation of passengers is part of "operation"

of bus).  The court observed that the inmates, being handcuffed, lacked the ability to fasten their

seatbelts themselves, and thus, relied on the van operator to ensure their safety.  Thus, the court

concluded that the defendant was not immune under the Governmental Immunity Act.

    The Court finds that Ms. DeRay's first category of allegations – that the officers violated

various department policies in arranging the transportation of Mr. Winkler – fail to constitute

"operation" of a vehicle.  In large part, the polices she references indicate <u>what</u> type of vehicle

particular types of suspects should be transported in (*e.g.* "requiring a caged vehicle"), or how

such transportations are reported (*e.g.* "informing the Field Supervisor of a high risk prisoner").

In essence, Ms. DeRay suggests that negligence in the <u>selection</u> of the vehicle that would

transport Mr. Winkler constitutes negligence in the <u>operation</u> of that vehicle.  The Court

disagrees.  The decision to use a particular vehicle or type of vehicle for a particular task is not

one that readily falls within the definition of "operation" of that vehicle.  Indeed, imagine a bus

depot in which a manager or dispatcher assigns drivers to take particular busses each day.  In

such circumstances, it is the dispatcher or manager who <u>selects</u> the particular vehicle that is to be

used for a given task, but that dispatcher or manager is not involved in any way with the actual

<u>operation</u> of the vehicle.  *See Harris*, 15 P.3d at 784 ("'operation' necessarily refers to the

actions of the operator related to physical control of the functions of the motor vehicle").

However, Ms. DeRay's listing of policy violations includes the violation of the policy requiring individuals to be transported in the back seat of non-caged patrol cars. One could reasonable argue that assigning passengers to suitable seating locations is akin to the "safe embarkation" in *Harris* or the fastening the seatbelts of inmates in *Young*. For example, if a bus operator directs an embarking disabled passenger to sit in a particular area that is unsuitable for that passenger's needs, and the passenger suffers an injury as a result, the result is similar to the situation in *Young* in which the operator's failure to safely prepare the inmates for transit was found to be "operation" of the vehicle. Accordingly, the Court finds that, to the extent that Ms. DeRay's negligence claim asserts that the officers were negligent in choosing to place Mr. Winkler in the front seat instead of the back, the claim is excepted from coverage of the Colorado Governmental Immunity Act.

The Court further notes that evidence in the record creates at least a triable issue of fact as to whether the decision to place Mr. Winkler in the front seat constituted a deviation from a duty of care. Ms. DeRay has tendered the report of a police practices expert, Mr. Emerson, and he opines that placing suspects in the back seat of a (non-caged) patrol vehicle reflects "the best practices in law enforcement" and that he knows of no police departments that have differing policies. He states his opinion that, by placing him in the front seat, "the officers could not have placed Mr. Winkler in a position which would have afforded them less access or control over him." Under these circumstances, a reasonable jury might conclude that the officers failed to exercise due care in selecting a place for Mr. Winkler to sit during transit, and that such failure was a proximate cause of his injury.

Ms. DeRay's second set of alleged acts of negligence all relate to the means by which Officer Sandoval operated the patrol vehicle during transit. While these allegations certainly

would fall within the definition of "operation," sufficient to bring her negligence claim outside of the Governmental Immunity Act, the Court finds that Ms. DeRay has failed to come forward with any evidence indicating that Officer Sandoval's actions deviated from any standard of care. She contends, for example, that Officer Sandoval was negligent in driving too fast, in selecting a highway route, and in engaging in "erratic driving."  Given that the officers are the only source of evidence regarding the transportation of Mr. Winkler, and their versions of events indicate that Officer Sandoval did nothing more than drive the vehicle in a reasonable manner under the circumstances, the Court finds that Ms. DeRay is unable to predicate a colorable negligence claim on such allegations.[7]

Accordingly, the Court finds that Ms. DeRay's common-law negligence claim can proceed, but it is limited to a claim that Officers Sandoval and Havenar were negligent in deciding to place Mr. Winkler in the front seat of the patrol car instead of the back seat.  Because Defendants Sheppard, Meyer, or the City of Colorado Springs were not involved in that particular decision, and Ms. DeRay has not articulated any other theory of negligence that would allow those Defendants to bear liability for Officer Sandoval and Havenar's negligence, those Defendants are entitled to summary judgment in their favor.

## **CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Summary Judgment **(# 35)** is

**GRANTED IN PART**, insofar as Defendants Sheppard, Meyer, and the City of Colorado

---

[7]    Ms. DeRay contends that the officers' failure to engage the child locks (that is, locks that, when engaged, prevent a door from being opened from the inside) on the vehicle constitutes a type of negligence in its operation.  However, Officer Sandoval testified in his deposition that the patrol vehicle has such locks only on the rear doors.  Thus, once the decision had been made to place Mr. Winkler in the front seat, there is no evidence that there were any child locks to be engaged.  Once again, then, any actionable negligence that may be asserted here springs solely from the decision to place Mr. Winkler in the front seat instead of the rear seat.

Springs are entitled to summary judgment on all claims against them, Defendants Sandoval and

Havenar are entitled to summary judgment on the substantive due process claim asserted against

them, and Defendant Havenar is entitled to summary judgment on Ms. DeRay's excessive force

claim, and **DENIED IN PART**, insofar as Ms. DeRay's claims against Defendant Sandoval

sounding in the use of excessive force in effecting Mr. Winkler's arrest and against Defendants

Sandoval and Havenar in common-law negligence arising out of the decision to place Mr.

Winkler in the front seat of the vehicle for transportation shall proceed to trial.  The parties shall

begin preparation of a Proposed Pretrial Order as directed in the Trial Preparation Order **(# 24)**

previously issued in this case, and shall jointly contact chambers promptly to schedule a Pretrial

Conference.

Dated this 19th day of March, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge